CDF LABOR LAW LLP
Mark S. Spring, State Bar No. 155114
mspring@cdflaborlaw.com
Arthur S. Gaus, State Bar No. 289560
agaus@cdflaborlaw.com
601 Montgomery Street, Suite 333
San Francisco, CA 94111
Telephone: (415) 981-3233

BELL NUNNALLY & MARTIN LLP
Mark A. Shoffner (*Pro Hac Vice*)
mshoffner@bellnunnally.com
Brent A. Turman, (*Pro Hac Vice*)
bturman@bellnunnally.com
Christian J. Cowart (*Pro Hac Vice*)
ccowart@bellnunnally.com
Meredith N. Palmer, (*Pro Hac Vice*)
mpalmer@bellnunnally.com
Katherine G. Rosenow, (*Pro Hac Vice*)
krosenow@bellnunnally.com
2323 Ross Avenue, Suite 1900
Dallas, TX 75201
Telephone: (214) 740-1400

*Attorneys for Plaintiff*
APOLLO INFORMATION SYSTEMS CORP.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APOLLO INFORMATION SYSTEMS CORP.,<br>Plaintiff,<br><br>v.<br><br>MONTY ST. JOHN and REYNALDO RAMON,<br>Defendants. | Case No. 5:26-cv-00523-PCP<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT** |

Plaintiff Apollo Information Systems Corp. ("Apollo") asserts the following claims of misappropriation of trade secrets, breach of contract, unjust enrichment, money had and received, breach of fiduciary duties, civil conspiracy, and declaratory judgment of ownership of Northumbria Intelligence Platform, DataSchism, CyberGestalt, and Sensemaking LLM against Defendants Monty St. John ("St. John") and Reynaldo Ramon ("Ramon").

## I. INTRODUCTION

1. Apollo seeks legal recourse against St. John and Ramon—both former employees—for their misappropriation of trade secrets, breaches of their employment agreements by the misuse of Apollo's confidential information, breaches of their fiduciary duties by the failure to disclose corporate opportunities and exercise of dominion over Apollo assets, and other wrongful conduct.

2. During their employment, St. John and Ramon were entrusted with highly confidential and proprietary systems and data, which Apollo utilizes to provide cybersecurity services for its customers. As a condition of their employment, both St. John and Ramon agreed to abide by Apollo's strict company policies regarding its trade secret and confidential information, including (1) restricting access to its information via an encrypted, password-protected computer system, and (2) mandating that they return any property and confidential information in their possession to Apollo upon the termination of their employment.

3. After Apollo discovered illicit and fraudulent conduct—including the invention of products or services that defendants later deceptively sold to Apollo—St. John and Ramon both voluntarily resigned. However, neither St. John nor Ramon returned Apollo's confidential information upon their resignation, and they have taken active steps to harm Apollo's business. For his part, St. John wiped his computer before returning it to Apollo in a transparent attempt to cover his tracks. Moreover, St. John and Ramon intentionally disrupted Apollo's business by failing to return Apollo's collections accesses, resources, and assets. To make matters worse, St. John later locked Apollo out of its own systems by changing the login information to a "password locker" to a username and password that only he could access. In other words, St. John and Ramon—two disgraced former employees—control the keys to Apollo's password locker and actively claim ownership over it.

4. Moreover, St. John altered the password locker login information on the same date—December 10—that Apollo confronted Ramon about questionable business practices and transactions. Ramon later confessed that he was "business partners" with St. John in a company called North Tools. Ramon and St. John not only created this new "business" while employees of

Apollo, but they even persuaded Apollo to purchase multiple services from it under false pretenses and without disclosure of their ownership in North Tools.

5. St. John and Ramon attempted to permanently damage Apollo's business and impact its ability to continue providing services to its customers and introducing new products to the market. Apollo brings this action to prohibit St. John and Ramon from continuing to unlawfully misappropriate and misuse its confidential and proprietary information and to seek redress for their tortious and fraudulent conduct. Apollo's business has been substantially harmed, and it seeks full recourse and monetary damages against St. John and Ramon.

## II. PARTIES

6. Apollo Information Systems Corp. is a Texas corporation doing business throughout the United States. Its principal place of business is in Dallas, Texas.

7. Monty St. John is a citizen of the State of Washington. He has appeared herein and is represented by counsel.

8. Reynaldo Ramon is a citizen of the State of Washington. He has appeared herein and is represented by counsel.

## III. JURISDICTION AND VENUE

9. This Court has original jurisdiction pursuant to 28 U.S.C. §1331, because this action involves a claim arising under the laws of the United States—the Defend Trade Secrets Act of 2016, 18 U.S.C. §1836, *et seq*. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

10. This Court has personal jurisdiction over St. John and Ramon because they consented in their respective employment agreements with Apollo to the "mandatory and exclusive jurisdiction" of either the United States District Court for the Northern District of California or the Superior Court for County of Santa Clara, State of California for "any proceeding between [Apollo and St. John or Ramon]."

/ / /

/ / /

/ / /

## IV. BACKGROUND FACTS

**A. Apollo is a cybersecurity services company that collects data from open and proprietary sources, analyzes the data, and provides intel to its clients for the purpose of risk mitigation.**

11. Apollo is a cybersecurity technology company that provides its clients with cyber intelligence information tailored to their specific risk exposure(s). Apollo collects information related to internet-based criminal operations to identify cybersecurity threats, advise its clients regarding the nature of those threats, and assist its clients in fortifying their digital defenses to neutralize those threats.

12. Apollo uses its undercover personas combined with its other commercial intelligence collection data to collect, gather, and analyze information that feeds into its proprietary counter threat operations system product ("CTOS Product") and help its clients counter cyberattacks by leveraging intelligence information derived from dark web monitoring. St. John and Ramon represented to Apollo that they deployed more than 1,000 of these undercover personas to perform intelligence gathering and collection.

13. Apollo's intelligence team spent significant time and assets developing the undercover personas—over the course of more than a decade—to obtain unique information from cyber criminals not generally known to, and not readily ascertainable through proper means means (such as the commercial intelligence collection data) by, others who can obtain economic value for the disclosure or use of the information. Each persona requires substantial investment of resources and time to effectively operate on the dark web to interact with and extract useful intelligence from cybercriminals. These requirements include mastery of languages, awareness and training on the historical activity of targeted individuals, and other reputational knowledge.

14. Apollo gathers information on the dark web. The dark web provides a digital, open-air black market for cybercriminals to advertise, sell, and purchase illegally obtained information. Information is listed for sale, and cybercriminals shop for and purchase information for their own illicit uses.

/ / /

15. The decentralized nature of the dark web makes it extraordinarily difficult to track the flow of illegally obtained information. Sellers use coded terms and other obfuscating techniques to prevent outsiders from gathering meaningful information regarding their products for sale. Unless a buyer knows what to seek, it is unlikely the buyer will gather any meaningful information.

16. Apollo navigates the dark web by utilizing proprietary personas, contracted management resources, and data obtained from commercial intelligence providers and other open-source data repositories. Apollo compiles this collective intelligence information from different sources. Apollo then leverages both its team of threat intelligence analysts and artificial intelligence to assemble the data to determine which of its customers are targets of online criminal activities. Apollo then works with its clients to implement counter-threat operations to deflect and/or defeat these criminal acts.

17. The raw data obtained from the personas is then processed, interpreted, and analyzed into functional data. In addition, this functional data is further processed and analyzed against the raw data obtained from certain commercial intelligence collection data. This commercial intelligence collection data is also not generally known to, and not readily ascertainable, because, among other reasons, each provider vets the subscriber to confirm they qualify as a cybersecurity provider and limits the raw data that subscribers may obtain, including by capping the number of queries and requiring selection of certain attributes.

18. Apollo gathers this information into a pool of raw data, which is known as its "data lake." The data lake has never been made public and has never been published. By combining the unique processed data secured through the undercover personas with the commercial intelligence data, Apollo's CTOS Product processes, interprets, and analyzes the raw data in the data lake into deliverables that provide unique insight on cybercriminals and vulnerabilities connected to Apollo's customers, including "Criminal Automation" data, "DNS Misconfiguration" data, and "Ops Data." For example, Apollo uses patterns in the data to trace illegally obtained information back to its source. In doing so, Apollo attempts to identify the original breach or vulnerability that was exploited by a cybercriminal to target its clients. Apollo compiles and organizes this information and presents it to its clients, so they can identify weaknesses and bolster their cybersecurity defenses. Apollo also

assists clients with neutralizing existing threats and reinforcing cybersecurity measures to prevent future cyberattacks.

**B. <u>St. John and Ramon began working for Apollo in 2022, when it acquired Cyber Defenses, Inc.</u>**

19. In June 2022, Apollo acquired Cyber Defenses, Inc. ("CDI"). St. John and Ramon were CDI employees at the time of the acquisition and based in Texas.

20. In connection with the acquisition, St. John and Ramon became Apollo employees. In addition, Apollo acquired CDI's assets, personas, technologies, intellectual property, and tradecraft.

21. Upon information and belief, St. John was a cybersecurity industry veteran with more than 20 years of experience in the cybersecurity and digital forensics industries, and Ramon was a researcher with more than 10 years of experience. St. John and Ramon initially performed well and were soon entrusted with important leadership roles that gave them access to Apollo's trade secrets and confidential and proprietary information. St. John served as Senior Director of Intelligence and was paid a base salary of $309,000.00 in 2025. Ramon served as a Threat Intelligence Analyst and was paid a base salary of $200,000.00 in 2025.

**C. <u>St. John and Ramon abused their positions by engaging in fraudulent activity and misappropriating Apollo's confidential and proprietary information.</u>**

22. St. John and Ramon abused their positions of trust and authority to defraud Apollo and abscond with its confidential and proprietary personas, information, property, and software.

23. In December 2024, St. John represented that a product called "Northumbria Intelligence Platform" was critical to Apollo's success and would increase efficiency and productivity for the analyst team that provided reporting to its clients. Apollo subsequently authorized St. John to purchase an annual subscription to this tool for $50,000 per year, which was paid by company credit card. At St. John's direction, Apollo paid these funds to a company called North Tools. The credit card charge, however, showed another entity as the merchant name—Sultrani. Sultrani is an entity associated with St. John. St. John later told Apollo that it no longer needed this subscription because the analyst team had outgrown the tool's capabilities, but by that

time, St. John had taken $50,000 in corporate funds for what he purported to be an arms-length, third-party transaction.

24. During the term of their employment with Apollo, St. John and/or Ramon made and/or conceived the subject matter of Northumbria Intelligence Platform. On information and belief, Northumbria Intelligence Platform relates to or resulted from the actual or demonstrably anticipated business, work, or research of Apollo, result, to any extent, from use of Apollo property, and/or are suggested by tasks assigned to them or any work performed by them for Apollo, including by reason of the fact that Defendants induced Apollo to subscribe to this product while concealing their affiliation and the product descriptions and functionalities outlined on https://www.northtools.org/northumbria-intelligence-platform.

25. In October and November 2025—during a period in which Apollo was working to launch a new product—St. John recommended two more urgent subscription services: DataSchism and CyberGestalt. In each instance, St. John represented to Apollo that information from these platforms was vital to its clients and necessary to bring the new third-party risk product to market. Apollo authorized two payments, one for $47,790 and another for $81,000 (for a total of $128,790) for these products or services. These payments were both made to CyberGestalt. Despite the purported urgency, St. John and Ramon failed to implement the data provided by these two products for the third-party product release.

26. As part of a proposed corporate spinoff, Apollo sought information related to DataSchism and CyberGestalt as it did not have a written contract for either service and there was no point-of-contact listed for these subscriptions or platforms. Apollo learned that St. John and/or Ramon registered the domains for CyberGestalt (cybergestalt.ca) on September 15, 2025, and DataSchism (dataschism.ca) on October 31, 2025. These were registered at or near the same time that St. John pushed Apollo to make these purchases. Moreover, North Tools, Northumbria Intelligence Platform, DataSchism, and CyberGestalt were created, organized, or registered by St. John and/or Ramon while employed by Apollo, and, therefore, all assets related to them are the property of Apollo.

/ / /

27. Ramon later told Apollo that he and St. John utilized Apollo's subscription to a third-party vendor—KeLa—to acquire dark web information that he then repackaged and sold to Apollo through DataSchism and CyberGestalt. Accordingly, St. John directed Apollo to pay his businesses for information Apollo already has access to or owned.

28. During the term of their employment with Apollo, St. John and/or Ramon made and/or conceived the subject matter of DataSchism. On information and belief, DataSchism relates to or resulted from the actual or demonstrably anticipated business, work, or research of Apollo, result, to any extent, from use of Apollo property, and/or are suggested by any task assigned to them or any work performed by them for Apollo, including by reason of the fact that Defendants induced Apollo to subscribe to this product while concealing their affiliation with it as well as the product descriptions and functionalities outlined on https://www.dataschism.ca/infostealer-data-and-what-to-do-with-it.

29. During the term of their employment with Apollo, St. John and/or Ramon made and/or conceived the subject matter of CyberGestalt. On information and belief, CyberGestalt relates to or resulted from the actual or demonstrably anticipated business, work, or research of Apollo, result, to any extent, from use of Apollo property, and/or are suggested by any task assigned to them or any work performed by them for Apollo, including by reason of the fact that Defendants induced Apollo to subscribe to this product while concealing their affiliation with it as well as the product descriptions and functionalities outlined on https://www.cybergestalt.org/why-you-need-this.

------------------------------------------------------------------------------------------------

30. On November 26, 2025, St. John advised John Watters and Dave Tyson that his health was deteriorating and hindering his ability to perform his role as Senior Director of Threat Intelligence. Shortly thereafter, Watters directed Sam Stover, Director of Technical Operations, to travel to Washington to meet with St. John and Ramon to discuss, identify, secure, gain access to, and/or transmit Apollo's confidential and proprietary information to ensure business continuity and knowledge transfer.

31. The principal purpose of these meetings was to discuss, identify, secure, gain access to, and/or transmit Apollo's confidential and proprietary information to ensure business continuity

and knowledge transfer. Specifically, St. John was to ensure that all Apollo trade secret and confidential information in his possession was available to Apollo. St. John and Stover were also to discuss the status of all projects he had been running for Apollo to ensure a smooth transition in light of St. John's health concerns. Finally, Ramon and Stover would discuss and collect the information needed to conduct training with the larger Apollo team at the upcoming, previously scheduled all-hands meeting.

32. Stover met with St. John and Ramon over the course of three days—from December 2 through December 4, 2025. Over that time period, Stover met with St. John in three two-hour meetings conducted via video conference.

33. In the final meeting with St. John on Thursday, December 4, 2025, when Stover asked to be provided with all Apollo assets being used for St. John's data collection activities, St. John told Stover that he had been provided with "all of the things that you just mentioned that belong to Apollo." St. John failed to comply with Apollo's request. He created a password locker that contained unhelpful and unusable information, and he failed to provide the tools needed to keep data and information flowing to Apollo's analysts. St. John was defensive to Stover's requests for information and called Stover's questions "accusatory."

34. On December 5, 2025—the next day—St. John resigned from Apollo effective immediately.

**D. <u>After his resignation, St. John accessed Apollo's system without authorization, altered the login and password to an Apollo account, and failed to return Apollo's property.</u>**

35. Apollo stores some of its data in a secured digital "password locker," an encrypted digital storage system that only authorized employees can access. The password locker was connected to an account established by CDI, which Apollo purchased in 2022. St. John had "admin" access to the password locker and could change the login credentials (*i.e.*, username and password).

36. On December 10, 2025, Apollo learned that an "admin" changed the login credentials for the password locker, thereby locking Apollo out of its own encrypted storage system. Upon information and belief, St. John was the "admin" who changed the login credentials. Dave Tyson, of Apollo, received an email notification that the email address associated with Apollo's password

locker had been changed to mxxxy@sxxxxxxi.com. This is the format of monty@sultrani.com. As of this date, Apollo is still unable to access the password locker, and all of the corresponding data therein likely remains in the possession, custody, or control of St. John.

37. Apollo also uncovered additional information regarding St. John's and Ramon's improper and unauthorized activity, in addition to the series of transactions whereby Apollo paid almost $180,000 to entities owned and controlled by St. John and Ramon. Just last month, St. John attempted to charge Apollo another $50,000 for a so-called subscription that was never authorized. Among other things, Apollo believes that St. John contacted KeLa (with whom Apollo had an existing subscription) to create a new account for Northumbria Tools to be billed to St. John at Sultrani. More importantly, St. John transferred Apollo's KeLa account to another Apollo employee—Max Tomayko—instead of Sam Stover as instructed by John Watters. Tomayko worked with St. John and Ramon at CDI and also lives in Washington state. Tomayko is no longer an Apollo employee and now works with St. John and Ramon.

38. Moreover, St. John failed to return Apollo property and continues to operate multiple businesses, platforms, and brands—North Tools, Northumbria, DataSchism, CyberGestalt—that he invented, created, or formed during the course and scope of his employment with Apollo and which are owned by and the property of Apollo. Upon information and belief, St. John continues to use these entities to disrupt and compete with Apollo's business. St. John's failure to return Apollo's property combined with his intentional disruption of its data sources and information flow forced Apollo to acquire another data collection company so that it could continue to provide services to its clients.

**E. <u>Ramon confesses to Apollo.</u>**

39. On December 10, 2025, Apollo executives met with Ramon in its Dallas, Texas office. Watters told Ramon that Apollo had no contracts with DataSchism or CyberGestalt. At first, Ramon stated that he did not know about these companies and St. John would have the relevant information. Watters then indicated that CyberGestalt and DataSchism were registered by St. John and had UPS mailboxes in Washington near the residences of St. John and/or Ramon. Later in the same discussion, after hearing Apollo's evidence, Ramon confessed that he and St. John were "business partners." He

later told the assembled Apollo executives that the name of their business was North Tools.

40. Ramon further confirmed that they had secured a KeLa license for North Tools on which to build the DataSchism and CyberGestalt product offerings. Upon information and belief, St. John and Ramon did not obtain their KeLa license until December 4, 2025, and, accordingly, they were improperly using Apollo's KeLa license prior to that date to create products and sell Apollo its own information and property.

41. On December 23, 2025—after an almost two-week vacation in Hawaii—Ramon resigned from Apollo effective immediately.

**F. <u>A fraudulent filing was submitted to the Washington State Department of Revenue to set up a "new" company bearing the same name as "Apollo Information Systems."</u>**

42. On December 19, 2025, Apollo learned that an unknown individual filed a fraudulent application for a new business license with the Washington State Department of Revenue for a purported "new" business entity bearing the same name as "Apollo Information Systems." The application requested an effective date of February 1, 2025, even though "Apollo Information Systems" had already been registered in Washington since 2023. The application was submitted using the personal information of Apollo's Chief Financial Officer, Kathleen Thomas ("Thomas"), including her name, date of birth, social security number, and cell phone number. The e-mail address listed on the application, however, did not belong to Thomas.

43. Apollo would have been unaware of the fraudulent application but for a phone call from a representative of the Washington State Department of Revenue, who called Thomas to confirm whether the application was legitimate (in light of the fact that "Apollo Information Systems" had already been registered in Washington since 2023). Thomas immediately informed the representative that the application was fraudulent.

44. The suspicious timing of the fraudulent application is alarming. The fraudulent application was submitted to the Washington Department of Revenue on December 4, 2025—the same date that St. John engaged in other actions relevant to his fraud (*i.e.*, generating a KeLa license for North Tools and transferring Apollo's KeLa license to Tomayko instead of Stover).

**G. <u>St. John and Ramon violated their contractual duties to maintain the confidentiality of Apollo's confidential information and trade secrets.</u>**

45. As a condition of their employment, both St. John and Ramon executed employment agreements containing strict confidentiality provisions. Apollo protects its confidential information by, among other things, restricting access to the information by limiting access to computer networks and requiring the use of passwords to access the information, utilizing password-protected software and restricted databases, educating its employees about the requirements and necessity of keeping this information confidential, and imposing specific requirements upon its employees (including St. John and Ramon) in their employment agreements.

46. Section 6 of their employment agreements contains policies regarding confidential information. Apollo's "Confidential Information" is defined as all information that "derives economic value from not being known to the general public or others who can obtain economic value from its disclosure" and/or that "is the subject of reasonable efforts on the part of Apollo to maintain its confidentiality." This includes "information regarding Apollo's business and marketing strategies."

47. Section 6.2 states that all Confidential Information St. John and Ramon received during their employment "is and shall at all times remain the exclusive property of Apollo."

48. Section 6.3 limits any use and disclosure of Apollo's Confidential Information, and requires employees "not to use any Confidential Information concerning Apollo for any purpose other than to fulfill his or her duties to Apollo and agrees not to disclose any such information to any third party without the express written consent of the Chief Executive Officer of the Company unless such disclosure is necessary in order for the Employee to perform his or her duties to Apollo or is required by applicable law."

49. Section 6.4 requires that, upon termination of employment, employees must return "any and all devices, records, documents, data, equipment, materials, and other property … which relate to Apollo or the business of Apollo and were created or received by the Employee during the course of his or her employment." Section 6.4 further requires employees to "provide Apollo with a written description of" any "property, documents or data in electronic form belonging to Apollo on

computer or other equipment owned by the employee[.]"

50. Section 7, entitled "Inventions," imposes strict requirements for "any and all inventions, ideas, discoveries, improvements, trade secrets, formulae, techniques, original works of authorship, mask words, processes and know-how" that were "made or conceived by the Employee, either alone or in conjunction with others, during the term of the Employee's employment with Apollo[.]" This extends to any such inventions that "(a) relate to or result from the actual or demonstrably anticipated business, work or research of the Company; (b) result, to any extent, from use of Apollo premises or property; or (c) are suggested by any task assigned to the Employee or any work performed by the Employee for the Company." Any such inventions "shall be the sole property of Apollo and the Employee hereby assigns to Apollo all of the Employee's right, title, and interest in such Inventions[.]" Any code, software, or other system St. John and/or Ramon developed during their employment that relates to Apollo's business is therefore Apollo's property under Section 7 of their respective employment agreements.

51. Each employment agreement provides space for the employee to disclose all inventions that he/she made prior to his/her employment with Apollo. Neither St. John nor Ramon disclosed any inventions encompassing the code, software, and/or digital materials they misappropriated from Apollo.

52. The resources that Apollo expended on protecting its Confidential Information allow its employees to develop and cultivate client accounts and relationships on behalf of Apollo. Apollo relies heavily upon repeat business and referrals from previous and current clients to maintain a competitive advantage in the highly competitive cybersecurity industry. Apollo's long-term success in the industry is dependent upon its customer relationships and goodwill in the industry. Apollo's Confidential Information therefore derives independent economic value from not being generally known to others. It would be extremely difficult, if not impossible, for others to acquire or duplicate Apollo's Confidential Information absent intimate knowledge of Apollo's inner development of its undercover personas and other computer systems and processes.

53. The information available to Apollo indicates that St. John and Ramon unlawfully possess its Confidential Information, and that they are in a position to disclose, disseminate, and/or

misuse that information to unlawfully compete with Apollo and disrupt its business. Apollo's current business is experiencing harm and disruption due to the deliberate and intentional acts of St. John and Ramon.

**FIRST CAUSE OF ACTION**

**MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836 ET SEQ.**
**(Against St. John and Ramon)**

54. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

55. Apollo owns and possesses confidential and proprietary trade secrets which are embodied in the CTOS Product, including unique and novel features implemented in a manner not generally known in the industry previously that gave Apollo an advantage over its competition including the specific arrangement and integration of the following unique features:

a. Compilation of comprehensive detailed information needed to operate over 1,000 undercover personas (including credentials, each individual persona's history, languages, operation sites, personal background, and other detailed information necessary to effectively operate the persona and avoid compromising the persona);

b. Collecting proprietary information from cybercriminals across the dark web obtained from over 1,000 undercover personas that Apollo's intelligence team spent significant time and assets developing each of the undercover personas (including spending 17 years for some of the personas) as well as, with respect to each persona, the individual data collection methodologies to obtain unique information from cybercriminals not generally known to and not readily ascertainable through other means such as the commercial intelligence collection data;

c. Processing, interpreting, and analyzing raw data into functional data;

d. Collecting commercial intelligence collection data (including data on Apollo's current and former business partners), which is also not generally known, and not readily ascertainable, because, among other reasons, each provider screens the subscriber to confirm they qualify as a cybersecurity provider and limit the raw data that subscribers may obtain,

including by capping the number of queries and requiring selection of certain attributes;

e. Data aggregation features that combine the proprietary persona-insider data with certain commercial intelligence collection data into a data lake, which has never been made public and has never been published;

f. Processing, interpreting, and analyzing the proprietary datasets that identify patterns in its "data lake" to trace illegally obtained information back to its source and provide deliverables with unique insight on cybercriminal activity (including "Criminal Automation" data, "DNS Misconfiguration" data, and "Ops Data"), allowing Apollo to communicate and informs its customers of threats and vulnerabilities.

(collectively, "Asserted Trade Secrets"). The foregoing constitutes "trade secrets" under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. §§ 1836 *et seq*. *See, e.g.*, *Juries.AI, Inc. v. Sheu*, No. 5:25-CV-10188-BLF, 2025 WL 3290235, at *4 (N.D. Cal. Nov. 25, 2025) (source code, individual data collection methodologies, interview results, business plans, pricing, and potential customers, which were "virtually every tool . . . required to reproduce the Juries.AI platform" were trade secrets under the DTSA); *WeRide Corp. v. Kun Huang*, 379 F.Supp.3d 834, 847 (N.D. Cal. 2019), modified in part, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (holding that source code warranted trade-secret protection); *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 115–16 (D. Mass.), aff'd, 118 F.4th 416 (1st Cir. 2024) (movant's internal data records regarding its current and former business partners, current contracts, target market, and short- and long-term projects were trade secrets under the DTSA); *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1250 (S.D. Fla. 2025) (document containing information about volume of products employer could produce in its plant during any given period by product line, information about capital expenditures needed to meet these volumes, information about new, unreleased products, including product recipes, and employer's projected revenue for one of its regions were trade secrets).

56. Apollo has made reasonable efforts to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information by, among other things (a) having employees—including St. John and Ramon—execute employment agreements prohibiting them from using its trade secrets and Confidential Information for any purpose other than

fulfilling their duties to Apollo, and instructing them not to disclose any Confidential Information without Apollo's consent; (b) requiring, as a condition of employment, that all employees acknowledge that all Confidential Information (including Apollo's trade secret information) is the property of Apollo and agree to return any Confidential Information in their possession upon the termination of their employment; (c) limiting access and restricting access to Apollo's trade secret information by employees on a need-to-know basis; (d) requiring unique usernames and passwords for its employees to access Apollo's trade secrets and Confidential Information on its computer systems and databases; and (e) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access trade secret information on Apollo's computer system, servers and networks, and storing certain of Apollo's Confidential Information in its secure, encrypted password locker. *See, e.g.*, *BNF Distribution Enter., Inc. v. BA Distribution, Inc.*, No. 25-CV-08527-AMO, 2025 WL 3724558, at *17 (N.D. Cal. Dec. 24, 2025) (at injunction phase, movant established it took steps to maintain the confidentiality of this information, including by limiting its dissemination within the company, password-protecting files, and providing verbal guidance to employees on the handling of confidential and sensitive information).

57. Apollo's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons and entities. Apollo competes with other cybersecurity companies in a tight, competitive market with a limited number of clients, and it gains an advantage in the market by keeping its trade secrets—including its undercover personas, proprietary systems, data obtained from commercial intelligence providers and other open-source data repositories, and other confidential and proprietary information stored on Apollo's password locker—secret from competitors that are seeking to obtain business from the same clients. *See Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) (finding independent economic value because the alleged trade secret allowed the holder to "recreate one of Plaintiff's top technologies," meaning that "Plaintiff's competitive edge would evaporate if the public and its competitors could easily recreate its products").

58. Apollo's Asserted Trade Secrets are crucial to the success of the implementation, operation, and maintenance of Apollo's proprietary technology and business development. They provide a decisive competitive advantage to Apollo and to anyone else with access to this information. Apollo's Asserted Trade Secrets provide the company with a critical market advantage in servicing its existing customers and attracting new ones.

59. Apollo provided St. John access to its trade secret information for the sole purpose of his use in connection with his employment with Apollo.

60. Apollo provided Ramon with access to its trade secret information for the sole purpose of his use in connection with his employment with Apollo.

61. Apollo uses it's Confidential Information in providing cybersecurity products and services to businesses located in states other than its headquarters in the State of Texas, and by regularly working with such businesses to provide ongoing, subscription-based cybersecurity services. As a result, Apollo's trade secrets satisfy the "interstate commerce" prong of the DTSA.

62. Upon information and belief, St. John and Ramon made an unauthorized copy of the Asserted Trade Secrets without Apollo's knowledge or consent.

63. Upon information and belief, St. John, either individually or through an entity he owns or controls, and in violation of his obligations of confidentiality to Apollo, sold an unauthorized and unlicensed copy of the Asserted Trade Secrets to Sultrani in or around 2024 without Apollo's knowledge or consent. In December 2024, St. John recommended that Apollo subscribe to "Northumbria Intelligence Platform" which was connected to North Tools / Sultrani. But this product is connected to Defendants. Sultrani is an entity associated with St. John.

64. Upon information and belief, St. John and/or Ramon, either individually or through an entity they own or control, and in violation of their obligations of confidentiality to Apollo, sold an unauthorized and unlicensed copy of the Asserted Trade Secrets to DataSchism and CyberGestalt in or around 2025 without Apollo's knowledge or consent. In October and November 2025, St. John recommended that Apollo subscribe to DataSchism and CyberGestalt. But these products are connected to Defendants. St. John and/or Ramon registered the domains for CyberGestalt (cybergestalt.ca) on September 15, 2025, and DataSchism (dataschism.ca) on October 31, 2025.

Defendants used improper means to transfer the Asserted Trade Secrets to North Tools, Sultrani, DataSchism, and CyberGestalt.

65. After illegally acquiring the unauthorized copy of the Asserted Trade Secrets, St. John and/or Ramon incorporated unique features of the CTOS Product and the proprietary intelligence data into Northumbria Intelligence Platform, DataSchism, and CyberGestalt.

66. St. John misappropriated Apollo's trade secrets by changing the login information for Apollo's "password locker." The password locker contains, among other proprietary information, Apollo's personas and other highly confidential encrypted data. In their respective positions with Apollo, St. John and Ramon had access to broad swaths of Apollo's trade secrets and Confidential Information, including direct login access to the password locker. Apollo has learned that (a) the login information (*i.e.*, username and password) for its password locker had been changed by an "admin" outside of Apollo's organization, (b) that St. John is most likely the "admin" who changed the login information, and (c) that St. John likely still possesses the login credentials for the password locker.

67. Further, Ramon misappropriated Apollo's trade secrets information without authorization because he acquired the trade secrets from St. John. Neither Ramon nor St. John has, or ever had, Apollo's express or implied consent to use its trade secrets, and Ramon knew or had reason to know that (a) St. John acquired Apollo's trade secrets under circumstances giving rise to a duty by him to maintain the confidentiality of, and to not disclose, the trade secrets, and (b) the trade secrets were derived through a person (St. John) who owed a duty to Apollo to maintain the confidentiality of, and to not disclose, trade secrets.

68. Defendants subsequently used and disclosed Apollo's Asserted Trade Secrets to North Tools and/or Sultrani. Accordingly, North Tools, Sultrani, and/or other entities owned or controlled by St. John or Ramon, and their employees are in possession of the Asserted Trade Secrets, which Defendants were expressly prohibited from disclosing according to their employment agreements with Apollo.

69. North Tools (through its agents St. John and Ramon) improperly acquired Apollo's Asserted Trade Secrets from Defendants, and on information and belief, have since improperly used

Apollo's Asserted Trade Secrets, including by incorporating them into the DataSchism and CyberGestalt software North Tools has designed and by using the Asserted Trade Secrets to feed North Tools's software with Apollo's raw data intelligence obtained from Apollo's personas to achieve Apollo's proprietary functionalities of its CTOS Product—exploiting Apollo's trade secreted data for its own advantage.

70. On information and belief, Defendants and North Tools saved millions of dollars in development costs because of the misappropriation of Apollo's Asserted Trade Secrets. In using these stolen trade secrets to develop a competing product, North Tools has diminished the value of Apollo's Asserted Trade Secrets to Apollo.

71. North Tools knew or had reason to know that Apollo's Asserted Trade Secrets were acquired through improper means, including through the fact that St. John and Ramon knew that they improperly acquired the raw data, functional data, subscription data, and analysis methods at the time these materials were used by St. John and Ramon while at Apollo and/or North Tools and for North Tools's benefit. Further, North Tools knew or had reason to know that Apollo's Asserted Trade Secrets were acquired through improper means as a result of its senior engineers and senior managers (St. John and Ramon) being aware that Apollo's data and personas were acquired through improper means, at least as a result of St. John and Ramon sharing Apollo's data during their employment. St. John's and Ramon's contributions to North Tools's data, by directly making additions to the data, should have alerted these other North Tool employees, if any, that Apollo's Asserted Trade Secrets were acquired through improper means. St. John's and Ramon's open sharing of Apollo's Asserted Trade Secrets during and after their employment is unlikely to be an isolated incident.

72. On information and belief, St. John and Ramon downloaded the access credentials for the thousands of personas, the raw data obtained from the access credentials, the subscription data, and analysis methods onto their personal computers, which occurred during their employment at Apollo.

73. St. John's and Ramon's intentional misappropriation and misuse of Apollo's trade secrets demonstrates that they will continue to use and disclose Apollo's trade secrets.

/ / /

74. Further, St. John's and Ramon's misappropriation of Apollo's Asserted Trade Secrets will cause irreparable harm to Apollo. Indeed, St. John's and Ramon's continued access to and use of Apollo's password locker, as well as their prevention of Apollo accessing same, will irreparably harm Apollo. Moreover, irreparable harm is presumed when trade secrets, such as Apollo's trade secret information, have been misappropriated. *E.g.*, *Comet Techs. United States of Am. Inc.*, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) (citing cases) (explaining that "courts in this district have 'presume[d] that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated'").

75. Moreover, St. John's and Ramon's failure to return Apollo's property combined with their intentional disruption its data sources and intelligence assets forced Apollo to acquire another data collection company so that it could continue to provide services to its clients. Defendants' actions also required Apollo to seek additional capital. Apollo seeks damages it incurred for this transaction and related actions.

76. Due to the improper and illegal actions of St. John and Ramon, Apollo is entitled to a preliminary and permanent injunctive relief.

77. As a direct, proximate, and foreseeable result of St. John's and Ramon's misappropriation of its trade secrets, Apollo has been damaged in an amount not yet ascertainable, including loss of profits, loss of contracts with its clients, loss of its goodwill, loss of competitive advantage, and loss of business opportunities. St. John and Ramon have been unjustly enriched as a further proximate result of their misappropriation of the Apollo Asserted Trade Secrets. Damages from lost contracts and goodwill continues to increase with the passage of time. Under the DTSA, Apollo is entitled to lost profit damages, as well as unjust enrichment damages. Further, because St. John and Ramon willfully and maliciously misappropriated Apollo's trade secrets, Apollo is entitled to exemplary damages.

/ / /

/ / /

/ / /

/ / /

**SECOND CAUSE OF ACTION**

**BREACH OF CONTRACT**
**(Against St. John and Ramon)**

78. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

79. In the respective employment agreements between Apollo and St. John and Apollo and Ramon, St. John and Ramon promised to maintain the confidentiality of Apollo's Confidential Information, and in return, Apollo promised to employ them and to disclose such Confidential Information to them in reliance upon their agreement to maintain confidentiality.

80. Apollo performed its promise under the respective agreements by providing to St. John and Ramon employment and its Confidential Information. However, St. John and Ramon each breached their respective employment agreements by misappropriating Apollo's Confidential Information and violating their respective agreements to maintain the confidentiality Apollo's Confidential Information.

81. St. John's and Ramon's respective breaches of contract have directly and proximately caused harmed Apollo and will continue to damage Apollo in the future.

82. Because of the harm, damages, and losses resulting from the foregoing respective breaches of contract by St. John and Ramon, Apollo has been forced to retain the undersigned counsel to protect and secure its rights. Pursuant to the provisions of Section 1717 of the California Civil Code, Apollo is entitled to recover its reasonable and necessary attorney's fees and costs herein, for which it now sues.

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**
**(Against St. John and Ramon)**

83. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

84. St. John and Ramon have been unjustly enriched by obtaining benefits through taking an unfair advantage by misappropriating Apollo's funds and unlawfully inducing Apollo to purchase

"subscriptions" for products Apollo already owned.

85. Apollo has been damaged by this wrongful conduct. As such, Apollo is entitled to judgment against St. John and Ramon for compensatory damages and for all further relief to which it is entitled at law or in equity.

**FOURTH CAUSE OF ACTION**

**MONEY HAD AND RECEIVED**
**(Against St. John and Ramon)**

86. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

87. St. John and Ramon have received money that was obtained by fraudulently inducing Apollo to purchase subscriptions for products or services that legally belonged to Apollo.

88. St. John and Ramon are currently in possession of and withholding this money, that in equity and good conscience belongs to Apollo.

89. Apollo has been damaged by this wrongful conduct. As such, Apollo is entitled to judgment against St. John and Ramon for compensatory damages and for all further relief to which it is entitled at law or in equity.

**FIFTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**
**(Against St. John and Ramon)**

90. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

91. As employees who participated in the management of Apollo and exercised discretionary authority, and as an individuals who were entrusted with trade secrets and Confidential Information, St. John and Ramon each had a respective fiduciary relationship with Apollo and owed Apollo fiduciary duties. St. John and Ramon were under an obligation not to usurp or misappropriate company opportunities for their personal gain.

92. St. John and Ramon breached their respective fiduciary duties, including their duties of loyalty, to Apollo by usurping opportunities and using or misappropriating Apollo's Confidential

Information, goodwill, and trade secrets and for the benefits of Defendants' competing ventures.

93. St. John's and Ramon's respective breaches of their fiduciary duties resulted in a significant, but largely incalculable, injury to Apollo and a benefit to them. Furthermore, St. John's and Ramon's respective breaches were intentional and therefore entitle Apollo to an award for exemplary and punitive damages.

**SIXTH CAUSE OF ACTION**

**CIVIL CONSPIRACY**
**(Against St. John and Ramon)**

94. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

95. St. John and Ramon are members of a common conspiracy.

96. The object of the conspiracy was to accomplish a number of unlawful purposes, including to misappropriate Apollo's trade secrets, to breach the fiduciary duties they owe to Apollo, and to fraudulently induce Apollo into purchasing products and subscriptions from businesses owned or controlled by St. John and Ramon. St. John and Ramon had a meeting of the minds to accomplish these unlawful purposes together.

97. St. John and Ramon, either directly or through agents acting, committed the overt acts of misappropriation of trade secrets and breach of fiduciary duties.

98. Apollo has suffered actual damages as a proximate result of St. John's and Ramon's conduct. Accordingly, Apollo is entitled to compensatory damages and all other further relief to which it is entitled at law or in equity. St. John and Ramon are jointly and severally liable for all acts done by them in furtherance of their unlawful conduct.

**SEVENTH CAUSE OF ACTION**

**Declaratory Judgment (28 U.S.C. § 2201)**
**(Against St. John and Ramon)**

99. Apollo repeats and realleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

/ / /

100. Based on the allegations in this complaint, there is a substantial, continuing, and justiciable controversy between Apollo and Defendants concerning the ownership of Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and all inventions, ideas, discoveries, improvements, trade secrets, formulae, techniques, original works of authorship, mask works, processes and know-how (including provisional applications, patent applications, or patent publications claiming priority to any patent or application (*i.e.*, "related Inventions")).

101. On information and belief, during the term of their employment with Apollo, St. John and/or Ramon made and/or conceived the subject matter of Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions in whole or in part which relate to or result from the actual or demonstrably anticipated business, work, or research of Apollo, result, to any extent, from use of Apollo property, and/or are suggested by any task assigned to them or any work performed by them for Apollo. Thus, pursuant to their respective employment agreements, Apollo, not Defendants or any other entity, is the true owner (or, alternatively, at least a joint owner) of Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions.

102. Pursuant to their respective employment agreements, St. John and Ramon assigned to Apollo all right, title, and interest in Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions.

103. Defendants improperly claim to be the true owner of Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions, which constitute an improper and unauthorized assignment of Apollo's interest and ownership of the inventions.

104. Apollo therefore seeks a declaratory judgment finding that Apollo is the sole, or alternatively a joint, owner of all right, title, and interest in Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions, that Apollo has the right to control prosecution of any patents, and that Apollo has the right to file in the future and to have issued to Apollo as the owner, respectively, any related Inventions.

## V. PRAYER

Wherefore, Apollo requests that judgment be entered in its favor and against St. John and Ramon, as follows:

1. A declaration that Apollo is the sole and exclusive owner of all right, title, and interest in and to Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions;

2. An injunction requiring Defendants to assign to Apollo Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions (including all related patents and patent applications);

3. A declaration that Apollo, if not the sole owner, is a joint owner of all right, title, and interest in and to Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions and that Apollo is further entitled to a pro rata undivided interest in said product, patent, patent application, and subsequently resulting patent;

4. An injunction requiring Defendants to execute the paperwork necessary for Apollo's participation in the prosecution before the U.S. Patent and Trademark Office and any applicable entity related to Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions (including all related patents and patent applications);

5. The imposition of a constructive trust on ownership of and rights to Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions;

6. Upon motion, a preliminary and permanent injunction enjoining St. John and Ramon from the following:

   a. Accessing, using, disclosing, distributing, possessing or disseminating Apollo's trade secrets and confidential and proprietary information and the services and products offered by Apollo to its clients;

   b. St. John and Ramon shall immediately return to Apollo all information, documents, and tangible things in their possession, custody, or control, whether in physical or digital format, including any copies thereof, that contain Apollo trade secret, confidential, or proprietary information.

7. For compensatory damages, lost profits, unjust enrichment, restitution, exemplary damages, and any other damages to which Apollo is entitled, in an amount to be shown at trial;

8. For Apollo's attorneys' fees;

9. For pre- and post-judgment interest and costs of suit incurred herein; and

10. For such further relief as the Court finds just and proper.

Dated: April 7, 2026

BELL NUNNALLY & MARTIN LLP

By: */s/ Mark A. Shoffner*
Mark A. Shoffner
Attorneys for Plaintiff
APOLLO INFORMATION SYSTEMS CORP.