United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

APOLLO INFORMATION SYSTEMS CORP.,
Plaintiff,
v.
MONTY ST. JOHN, et al.,
Defendants.

Case No. 26-cv-00523-PCP

**ORDER GRANTING IN PART MOTION TO DISMISS**

Re: Dkt. No. 59

Plaintiff Apollo Information Systems Corp. sues defendants Monty St. John and Reynaldo Ramon, both former employees of Apollo, for stealing confidential information from Apollo and for inducing Apollo to purchase products or subscriptions from companies that turned out to be owned or controlled by St. John and Ramon. Defendants move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, defendants' motion to dismiss is granted in part and denied in part.

**BACKGROUND**

Apollo is a cybersecurity technology company that researches cybersecurity threats, including on the dark web, to warn and protect clients.[1] Amended Complaint (AC) ¶¶ 11, 12. In 2022, after Apollo acquired the company where defendants were working, defendants joined Apollo, with St. John becoming Senior Director of Intelligence and Ramon becoming a Threat Intelligence Analyst. AC ¶¶ 19–21.

In December 2024, St. John allegedly told Apollo that it should purchase a product called "Northumbria Intelligence Platform." Apollo did so, paying $50,000 per year to a company called

[1] The Court assumes the truth of the allegations in the amended complaint for the purposes of defendants' Rule 12(b)(6) motion.

North Tools. AC ¶ 23. The credit card Apollo used to pay for the product, however, registered a payment to a merchant called "Sultrani," which Apollo alleges "is an entity associated with St. John." AC ¶ 23. St. John eventually told Apollo that it did not need the product anymore but Apollo had already paid $50,000.

In October and November 2025, St. John recommended Apollo purchase two more subscription services called DataSchism and CyberGestalt. AC ¶ 25. Apollo authorized payments for $47,790 and $81,000, both of which were made to CyberGestalt. AC ¶ 25. Apollo alleges that St. John and Ramon never used the products for Apollo's product launch. AC ¶ 25. Later, Apollo looked into DataSchism and CyberGestalt and found that St. John or Ramon had registered the domains for the products on September 15, 2025 (CyberGestalt) and October 31, 2025 (DataSchism), around the time when "St. John pushed Apollo to make these purchases." AC ¶ 26. Ramon allegedly told Apollo that he and St. John used Apollo's internal subscription to a different service to acquire information from the dark web and then sell it back to Apollo through the DataSchism and CyberGestalt products. AC ¶ 27. Apollo alleges that St. John and Ramon generated the ideas for Northumbria Intelligence Platform, DataSchism, and CyberGestalt during their employment with Apollo. AC ¶¶ 24, 27, 28.

On November 26, 2025, St. John told Apollo that his health was declining. AC ¶ 30. Apollo Director of Technical Operations Sam Stover met with St. John and Ramon from December 2 through December 4, 2025, in three two-hour video meetings, to secure Apollo's confidential information. AC ¶¶ 30, 32. St. John told Stover that he gave Stover all the Apollo assets used for St. John's data collection, but St. John also allegedly "created a password locker … and … failed to provide the tools needed to keep data and information flowing to Apollo's analysts." AC ¶ 33. The next day, on December 5, St. John resigned from Apollo effective immediately. AC ¶ 34.

Apollo accuses St. John of changing the login credentials for Apollo's password locker on December 10 so that Apollo employees could not access Apollo's passwords. AC ¶¶ 35, 36. As late as March 2026, St. John tried to charge Apollo for an unauthorized $50,000 subscription payment. AC ¶ 37. Apollo alleges that St. John contacted third-party vendor KeLa (with whom

Apollo has a subscription) and got Kela to transfer Apollo's account to an Apollo employee named Max Tomayko, who has since left Apollo and currently works with defendants. AC ¶ 37. St. John allegedly continues to use North Tools, Northumbria, DataSchism, and CyberGestalt. AC ¶ 38.

On December 10, 2025, Ramon allegedly confessed to Apollo that he and St. John were "business partners" in an enterprise named North Tools. AC ¶ 39. Ramon says that he and St. John used Apollo's KeLa license to build the DataSchism and CyberGestalt products. Complaint ¶ 40. Ramon resigned from Apollo on December 23, 2025. AC ¶ 41.

Apollo alleges that, on December 19, 2025, someone filed a fraudulent new business license with the Washington State Department of Revenue for a business that would have been called "Apollo Information Systems." AC ¶ 42. That person allegedly submitted the new business application on December 4, 2025, using the identifying information of Apollo's CFO. AC ¶¶ 42, 44.

Apollo alleges that St. John and Ramon both had employment agreements with strict confidentiality and invention-assignment provisions. AC ¶¶ 45 53.

Apollo brings seven claims against defendants for federal trade secret misappropriation, breach of contract, unjust enrichment, money had and received, breach of fiduciary duty, civil conspiracy, and a declaratory judgment. Apollo seeks a "declaration that Apollo is the sole and exclusive owner of all right, title, and interest in and to Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions." Complaint at 25. Apollo also seeks injunctions requiring defendants to assign inventions to Apollo, to "execute the paperwork necessary" for Apollo to prosecute pending patents before the US Patent and Trademark Office, and to establish a constructive trust over defendants' businesses and inventions. Apollo also seeks a preliminary and permanent injunction requiring defendants to stop using their trade secrets and other confidential or proprietary information and to return all of Apollo's assets. Finally, Apollo also seeks damages, fees, costs, interest, and any other just and proper relief. Complaint at 26.

United States District Court
Northern District of California

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint does not do so, the defendant may move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## ANALYSIS

Defendants move to dismiss all of Apollo's claims under Rule 12(b)(6). For the reasons stated below, the Court denies defendants' motion as to all claims except for Apollo's breach of fiduciary duty claim against Ramon and its request for a declaratory judgment regarding Sensemaking.

### I. Federal Trade Secret Misappropriation

Defendants move to dismiss Apollo's federal trade secret claim for failure to plead a protectable trade secret, misappropriation, and any connection to interstate commerce.

**A. Protectable Trade Secret**

The federal Defend Trade Secrets Act (DTSA) defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if [] (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Apollo has plausibly alleged that a protectable trade secret is at issue here. Apollo alleges that it has a "proprietary counter threat operations system product ('CTOS Product')" that it offers to help clients defend against cyberattacks. AC ¶ 12. Apollo lists six "unique features" that are "embodied in the CTOS Product" and that constitute protectable trade secrets. Compilations of "generally available sources that are matters of public knowledge" can be protectable. *See Experian Info. Sols., Inc. v. Nationwide Mktg. Servs., Inc.*, 893 F.3d 1176, 1188 (9th Cir. 2018); 18 U.S.C. § 1839(3). Apollo's propriety combination of the types of information alleged in paragraph 55 plausibly qualifies as unique compilation of information for DTSA purposes. AC ¶ 55.

Defendants' arguments as to why Apollo has not pleaded a protectable trade secret are not persuasive. First, defendants argue that Apollo's "personas"—the identities Apollo uses to interact with dark web participants and gather information—are not protectable because, by interacting with third parties, the personas reveal some information about themselves and are not secret. Motion to Dismiss at 11-12. But not all of the information that goes into the personas is disclosed to third parties, and the development and characteristics of the personas are presumably broader than simply the personas' identification. *See* AC ¶¶ 12–13, 55b. Indeed, the value of the personas almost certainly derives from the fact that Apollo does not disclose to others on the dark web that the personas are associated with a cybersecurity firm.

Second, defendants argue that Apollo cannot both "own[] and possess[]" the personas and yet have been locked out of using them through St. John's allegedly changing the password locker credentials. But Apollo can have a legal entitlement to use of such intangible property yet be hindered in that use by St. John's changing of a technical requirement for use.

Third, defendants argue that merely "processing, interpreting, and analyzing raw data into functional data" is insufficient to constitute a trade secret. Motion to Dismiss at 13. But to the extent that Apollo alleges that it transforms raw data and compiles it into "functional data" that is economically useful, Apollo has done enough to allege a trade secret.

Fourth, defendants argue that Apollo cannot claim trade secrecy over information that came from commercially licensed data. Motion to Dismiss at 13. But if the proprietary data is not "generally known" and Apollo operated on that data to make it usable in ways that provide independent economic value, the mere fact that it originated with a third-party commercial provider does not deprive Apollo's unique compilation of trade secret protection.

Fifth, defendants argue that Apollo's use of a "data lake" in which Apollo collects raw data for use in its business is not protectable because Apollo has not alleged what it did to that data "that adds independent value." Motion to Dismiss at 13–14. But Apollo has described its "treatment" of the data in the data lake, alleging that its CTOS product "processes, interprets, and analyzes the raw data in the data lake into deliverables that provide unique insight on cybercriminals and vulnerabilities connected to Apollo's customers." AC ¶ 18.

Sixth, defendants argue that paragraph 55f's reference to tracing illegal information back to its source and providing that information as a deliverable is not a trade secret because it merely involves the output of a process. Motion to Dismiss at 14. Whether such conduct on its own would be protectable, the overall system through which Apollo collects, analyzes, and makes use of its compilation of data plausibly constitutes a trade secret.

Finally, Apollo has alleged that it took reasonable measures to keep its CTOS product secret, including by including storing data in a "secured digital 'password lock,'" AC ¶ 35, including confidentiality requirements in its employee agreements, AC ¶¶ 45-49, and requiring unique login credentials for employees to access Apollo's confidential information. AC ¶ 56.

Therefore, Apollo has plausibly pleaded the existence of a protectable trade secret.

**B. Misappropriation**

Under the DTSA, misappropriation includes knowing acquisition of a trade secret or unauthorized or improper disclosure or use of a trade secret. *See* 18 U.S.C. § 1839(5).

Apollo has plausibly pleaded misappropriation because it alleges that St. John disclosed Apollo's login credentials to himself and made a copy of the data in the password locker. AC ¶ 36. Apollo also argues that the Court can infer misappropriation of its trade secrets based on defendants' "competing Northumbria product," which, like Apollo, offers cybersecurity tools to customers. Apollo argues that defendants compete against Apollo because of their access to personas, raw data, subscription data, and analysis methods that defendants obtained on their personal computers during their time at Apollo. Opposition at 22 (citing AC ¶¶ 64, 72). Because one can infer that defendants used Apollo trade secrets to offer competing products, Apollo has plausibly alleged misappropriation.

**C. Connection to Interstate Commerce.**

Because Apollo's services are offered over the internet, one can plausibly infer that DTSA's interstate commerce requirement is satisfied. Therefore, Apollo plausibly pleads trade secret misappropriation under the DTSA.

**II. Breach of Contract**

Defendants move to dismiss the breach-of-contract claim for lack of a breach, arguing that Apollo has not shown misappropriation of a trade secret or confidential information. Motion to Dismiss at 18. But Apollo has plausibly pleaded a breach of contract because it alleges that St. John "failed to comply with Apollo's request" to return "all Apollo assets being used for St. John's data collection activities." AC ¶ 33. Further, Apollo alleges that St. John still has not restored to Apollo access to its password locker. AC ¶ 36. Thus, Apollo pleads a breach of Section 6.3 of its employment agreement, which required defendants "not to use any Confidential Information concerning Apollo for any purpose other than to fulfill his or her duties to Apollo…." AC ¶ 48.

United States District Court
Northern District of California

**III. Unjust Enrichment**

Defendants move to dismiss the unjust enrichment claim on two grounds. First, defendants argue that California law does not have a cause of action for unjust enrichment. Motion to Dismiss at 8. Though California law does not have a cause of action specifically called "unjust enrichment," California law does allow for "a quasi-contract claim seeking restitution." *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Quasi-contract claims do not require "privity of relationship" but only that one "has been unjustly enriched at the expense of another." *Hartford Cas. Inc. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015). Though a plaintiff cannot ultimately recover on both a quasi-contract claim and a breach of contract claim, Apollo can plead a quasi-contract claim in the alternative. *See Luxton v. Maneuver Mktg. PTE. Ltd.*, 835 F. Supp. 3d 1043, 1049–50 (N.D. Cal. 2026).

Second, defendants argue that Apollo fails to state a claim for unjust enrichment based on defendants "unlawfully inducing Apollo to purchase 'subscriptions' for products Apollo already owned." AC ¶ 84; Motion to Dismiss at 19. Apollo argues that its unjust enrichment claim would provide redress for improper benefits defendants obtained from Apollo that would not be covered by the breach-of-contract claim. Apollo plausibly states a claim for unjust enrichment by alleging that defendants created competing platforms during their employment with Apollo and then used deception to obtain payments from Apollo to those competing platforms. AC ¶¶ 23, 24, 25, 28–29, 84.

**IV. Money Had and Received**

A claim for money had and received requires "(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment." *Lopez v. Bank of Am., N.A.*, 505 F. Supp. 3d 961, 975 (N.D. Cal. Dec. 4, 2020) (quoting *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 459 (1997)). An alternative formulation is that 1) the defendant "received money that was intended to be used for the benefit of the plaintiff; 2) the money was not used for the benefit of the plaintiff, and 3) defendant has not given the money back to the plaintiff." *See* Common Count: Money Had and Received, Jud. Council of Cal. Civ. Jury Instrs. (2026).

Apollo has stated a claim for money had and received. Apollo alleges that defendants received money meant to benefit Apollo "by fraudulently inducing Apollo to purchase subscriptions for products or services that legally belonged to Apollo." AC ¶ 87; *see also id.* ¶¶ 23-25. Apollo accuses St. John of inducing Apollo to subscribe to Northumbria Intelligence Platform for $50,000. AC ¶ 23. In October and November 2025, St. John recommended Apollo purchase two more subscriptions, which it did. Complaint ¶ 25. Both payments were to a company called CyberGestalt, which turned out to be defendants' company. Complaint ¶¶ 25, 26.

Defendants allegedly "received money that was intended to be used for the benefit of the plaintiff" because they received the money that Apollo "intended to be used for" purportedly useful subscriptions. The money was "not used for the benefit of the plaintiff." While Apollo appeared to have received the benefit of at least some of the subscription services it paid for, specifically Northumbria Intelligence Platform, Apollo was unable to benefit from the subscription to CyberGestalt, which St. John claimed was necessary "to bring the new third-party risk product to market" yet "St. John and Ramon failed to implement the data provided by these two products for the third-party product release." AC ¶ 25. There is no indication that Apollo has received the money back from defendants. Therefore, Apollo has stated a claim for money had and received.

**V. Breach of Fiduciary Duty**

Defendants argue that Ramon did not have a fiduciary duty to Apollo and that Apollo has not established a breach of a fiduciary duty. "Employment-type relationships are not fiduciary relationships." 3 Witkin, Summary 11th Agency § 3 (2026) (citing *Amid v. Hawthorne Cmty. Med. Grp.,* 212 Cal. App. 3d 1383, 1391 (1989), and *O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 94 Cal. App. 4th 797, 811 (2001)). Ramon was a "Threat Intelligence Analyst" for Apollo. AC ¶ 21. Apollo does not respond to defendants' argument that Ramon did not owe Apollo a fiduciary duty. Instead, Apollo only reiterates that St. John was a "Senior Director of Intelligence." Opposition at 25; AC ¶ 21. Therefore, Apollo has not pleaded that Ramon owed Apollo a fiduciary duty.

Apollo nonetheless plausibly pleads that St. John breached a duty of loyalty to Apollo. St. John was a "Senior Director of Intelligence," AC ¶ 21, and had interests on both sides of Apollo's

transactions with DataSchism and CyberGestalt as an agent of Apollo and as the assumed proprietor of DataSchism and CyberGestalt. AC ¶¶ 25, 26. He thus failed to disclose relevant information that would have served Apollo's interests. *Cf. Knutson v. Foster*, 25 Cal. App. 5th 1075, 1095 (2018). Apollo also alleges that St. John breached his fiduciary duty to Apollo by misappropriating Apollo's trade secrets for his own benefit. Accordingly, defendants' motion to dismiss the breach of fiduciary duty claim is granted as to Ramon and denied as to St. John.

## VI. Civil Conspiracy

Apollo plausibly states a claim for civil conspiracy. The parties agree that pleading a civil conspiracy requires showing 1) formation (an agreement); 2) operation (commission of wrongful acts) and 3) damage. *See* Motion to Dismiss at 9; Opposition at 26. Ramon "confessed that he was 'business partners' with St. John in a company called North Tools." AC ¶¶ 4, 40, 41. Ramon allegedly told Apollo that "he and St. John utilized Apollo's subscription to a third-party vendor—KeLa—to acquire dark web information that he then repackaged and sold to Apollo through DataSchism and CyberGestalt." AC ¶ 27. Defendants' arguments rely entirely on establishing that Apollo has failed to state the underlying claims as a matter of law. *See* Motion to Dismiss at 21. As discussed above, Apollo's has stated multiple claims. Therefore, defendants' motion to dismiss the civil conspiracy claim is denied.

## VII. Declaratory Judgment

Apollo seeks a declaratory judgment regarding its ownership of "Northumbria Intelligence Platform, DataSchism, CyberGestalt, Sensemaking LLM, and any related Inventions." AC ¶ 101. Apollo cites defendants' employment agreements, which provide that all inventions "made or conceived" by defendants "during the term of … [their] employment with Apollo" "shall be the sole property of Apollo" and assign Apollo all interests and rights in such inventions. Complaint ¶¶ 50, 102. Apollo alleges "[o]n information and belief" that, "during the term of their employment with Apollo," defendants conceived of the ideas for Northumbria, DataSchism, CyberGestalt, and Sensemaking. Complaint ¶ 101.

Defendants do not substantially challenge Apollo's allegations but note that Apollo's request for declaratory relief refers to a product called "'Sensemaking LLM' that does not appear

anywhere else in the [Amended Complaint].” Motion to Dismiss at 22. The only other place “Sensemaking” appears is on the first page when Apollo lists the claims it is making. Complaint at 1. At the hearing on Apollo’s motion, counsel for Apollo acknowledged that they do not seek a declaratory judgment as to Sensemaking. Therefore, defendants’ motion to dismiss Apollo’s declaratory judgment request is denied except as to Sensemaking.

**CONCLUSION**

For the above reasons, defendants’ motion to dismiss is granted as to the breach of fiduciary duty claim against Ramon and the declaratory judgment claim regarding Sensemaking LLC. The motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: September 28, 2026

P. Casey Pitts
United States District Judge